**KINGSTON HILL ACADEMY
and The Compass School**

v.

**CHARIHO REGIONAL SCHOOL
DISTRICT.**

No. 2010–362–M.P.

Supreme Court of Rhode Island.

June 6, 2011.

---

Jon M. Anderson, Esq., Providence, for Petitioner Chariho Regional School District.

Timothy J. Groves, Providence, Esq., for Respondent The Compass School.

Sara Rapport, Esq., Providence, for Respondent Kingston Hill Academy.

Present: SUTTELL, C.J., FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice INDEGLIA, for the Court.

■ The Chariho Regional School District (Chariho or petitioner) filed a petition for the issuance of a writ of certiorari seeking our review of a decision of the Rhode Island Board of Regents for Elementary and Secondary Education (the board) upholding the decision of the commissioner of elementary and secondary education (the commissioner) to characterize the petitioner's asserted affirmative defense as a counterclaim and to sever it for separate proceedings. The petitioner also seeks review of the portion of the board's decision reversing the commissioner's interpretation of G.L.1956 § 16–77.1–2(d) to require that the local-district payments for Chariho students attending Kingston Hill Academy (Kingston Hill or respondent) and The Compass School (Compass or respondent), collectively respondents or charter schools, be calculated based on the number of students attending the charter schools as of June 30 of the "reference year."[1] This Court granted the petition,

---

**1.** The general procedure for appeals before the Rhode Island Department of Education (RIDE) is as follows: "Parties having any matter of dispute between them arising under any law relating to schools or education may appeal to the commissioner of elementary and secondary education * * *." G.L.1956 § 16–39–1. After hearing the arguments of the parties, a hearing officer issues a decision and order to the commissioner of RIDE for approval. A party may appeal this decision to the Rhode Island Board of Regents for Elementary and Secondary Education (the board). G.L.1956 § 16–39–3. This Court then may review the opinion of the board by way of a common-law writ of certiorari. *Jacob v. Burke*, 110 R.I. 661, 670, 296 A.2d 456, 461 (1972).

and Chariho's case came before the Supreme Court for oral argument on May 5, 2011, pursuant to an order directing the parties to appear and show cause why the issues raised in this petition should not be decided summarily. After considering the parties' submitted memoranda and oral arguments, we are satisfied that cause has not been shown and proceed to decide the petition at this time. For the reasons set forth in this opinion, we affirm the decision and order of the board, deny the petition for certiorari, and quash the writ heretofore issued.

## I

### Facts and Travel

The respondents are two charter public schools serving the Chariho school district. On January 14 and 15, 2010, respondents requested that Deborah Gist, the commissioner, grant an expedited hearing to address "the dispute between [Chariho] and [the charter schools] regarding nonpayment by Chariho of tuition owed" to respondents. The charter schools averred that they both had submitted invoices to Chariho (Kingston Hill in September and October 2009 and Compass in October 2009 and January 2010) seeking quarterly tuition payments for students residing in the Chariho school district who attended the charter schools during the 2009–2010 school year. Also, they both asserted that Chariho did not make payment on the invoices and was in arrears. The respondents alleged that the total amount due and payable to them by Chariho was $413,231.84.

In correspondence dated January 15, 2010, Chariho objected to the requests for an expedited hearing and denied Kingston Hill's allegations. The petitioner objected to the requests on the grounds that RIDE had prejudged the matter; that expedition was not necessary because any remedy could not be effectuated until the next state-aid payment was made to Chariho in April 2010; and that respondents' claims should not be consolidated. Additionally, Chariho argued that it would be prejudiced by an expedited hearing because it planned to raise "as an affirmative defense" that Kingston Hill had "unclean hands" as a result of discriminatory policies,[2] and it contended that the need for extensive discovery on this issue precluded expedition.

The parties appeared before a hearing officer on February 5, 2010, to address these issues. After hearing the arguments of the parties, on March 1, 2010, the hearing officer issued an interlocutory decision approved by the commissioner addressing respondents' requests for an expedited resolution and petitioner's objections. First, the commissioner dismissed the contention that a RIDE employee had prejudged the matter. Next, she determined that expedition was unnecessary and consolidated the claims. Finally, the commissioner concluded that, with regard to the affirmative defense of unclean hands, petitioner was "attempting to assert something in the nature of a counter claim," and she "sever[ed] this claim" for a later hearing because it was "tangential, at best, to the tuition reimbursement claims which [were] at the heart of [the] matter." She concluded that the remaining issue presented could be resolved "based on memoranda of law to be submitted by the parties," and no further hearings on this matter were necessary.

Accordingly, the parties submitted memoranda to support their respective positions. Kingston Hill argued that Chariho

---

**2.** The petitioner noted that it reserved its right to raise the same defense against Compass.

incorrectly interpreted § 16–77.1–2(d)[3] and § 16–77.1–2(e)[4] to require it to remit tuition payments to charter schools for a number of students as determined by a "reference year"[5] rather than on the basis of actual enrollment of Chariho district students in the charter schools each quarter. Kingston Hill contended that such an interpretation "defie[d] the plain language of the statute and r[an] contrary to its purpose and intent" and also "contravene[d] the directive of [RIDE]" to "charter schools to issue invoices to local school districts based on the students actually in attendance during each quarter of the current fiscal year." The respondent argued that the "reference year" was relevant only to "calculating *state* funding of charter public schools." (Emphasis added.) Therefore, it "request[ed] that the amount of $259,504 be deducted from the state aid to be paid to Chariho, and that this arrearage be paid directly to Kingston Hill."

Compass offered substantially similar arguments. Likewise, it argued in its memorandum that "the reference year student membership is appropriate for calculating *state* aid, but not appropriate for calculating the local district's obligations." (Emphasis added.) Compass asserted that Chariho was responsible for payments to Compass calculated on the basis of "the number of Chariho students enrolled, or registered, in Compass for the 2009–10 school year." Therefore, it requested as relief "that the total amount over thirty (30) days in arrears, $241,791.84, be deducted from the state aid to Chariho and paid by the state directly to Compass."

Conversely, Chariho argued that the commissioner could not compel Chariho to make payments to the charter schools or direct portions of Chariho's state aid to respondents because it would amount to aiding or perpetuating discrimination toward disabled students. Furthermore, it maintained that § 16–77.1–2 dictates that the payments it must remit to the charter schools be based on the number of students enrolled as of June 30 of the reference year. Therefore, Chariho requested that the commissioner refrain from lending the charter schools an advantage over the traditional public schools through "exemption [from] the reference year requirement."

After reviewing the parties' submitted memoranda, the hearing officer endeavored to resolve the "financial dispute about how the local share of charter school reimbursement should be computed." The hearing officer found that "[t]he statute could not be clearer" and that it unambiguously directed that the "reference year" was to be used to calculate the district's

3. General Laws 1956 § 16–77.1–2(d) provides, in pertinent part:
 "The state shall make payments of its share of operating costs to each charter public school on a quarterly basis in July, October, January, and April. The July and October payments will be based upon the reported student membership of the charter public school as of June 30 of the reference year as defined in § 16–7–16(11) (or the enrollment as of October 1 of the current school year in the first year of operation of a charter school)."

4. Section 16–77.1–2(e) provides in pertinent part: "Local district payments to charter public schools for each district's students enrolled in the charter public school shall also be made quarterly as designated in subsection (d); the first local district payment shall be made by August 15 instead of July."

5. "Reference year" is defined in the context of state financial school support as "the next year prior to the school year immediately preceding that in which the aid is to be paid." G.L.1956 § 16–7–16(11). Thus, in the instant dispute, the reference year that Chariho seeks to govern the number of students for whom it is responsible to make tuition payments to the charter schools is 2008.

share. As such, Chariho was "directed to pay forthwith all sums due and owing to [the charter schools] using as a computational basis the reference year." The hearing officer noted "that [the] matter [was] immediately appealable to the Board of Regents." The commissioner endorsed the decision.

The charter schools filed an appeal with the board from the decision of the commissioner. Chariho filed a cross-appeal challenging the interlocutory decision " 'severing' [its] affirmative defense." On October 7, 2010, the board issued a decision reversing the commissioner's interpretation of § 16–77.1–2 and "hold[ing] that Chariho must pay tuition to [the charter schools] for each Chariho student attending the charter public school that school year." The board based its conclusion on the plain language of the statute, the purpose of the statute, and its opinion that a contrary interpretation "would produce results which are illogical, unworkable, and absurd." Accordingly, it directed Chariho "to pay * * * all sums due and owing to Compass and to Kingston Hill for fiscal year 2010 * * * using as a computational basis the number of Chariho students who were actually enrolled in [the charter schools] * * *, at the start of each quarter." It directed Chariho to do the same for fiscal year 2011. Further, the board affirmed the decision of the commissioner to sever Chariho's counterclaim.

On October 20, 2010, Chariho petitioned this Court for a writ of certiorari to review the board's decision. To support its petition, Chariho argued that the board erred in violation of due process when it affirmed the commissioner's decision severing its "affirmative defense" of unclean hands. Additionally, it argued that notwithstanding this error, the board's interpretation of § 16–77.1–2 was incorrect as a matter of law because it "rewrote" the statute to require Chariho to make payment based on "actual enrollment." Chariho also filed motions in this Court for a stay of the board's decision and for summary remand to the board to elaborate on its decision to affirm the commissioner's decision to sever its "affirmative defense," both of which we denied on October 22 and November 22, 2010, respectively. On November 22, 2010, this Court granted Chariho's petition for a writ of certiorari. We denied Chariho's renewed motion for a stay on February 11, 2011.

## II

### Issues for Review

The petitioner presents three issues. Specifically, (1) whether the commissioner and board properly "sever[ed] Chariho's affirmative defense * * * without holding a hearing as to whether the [respondents] violated [G.L.1956] § 42–87–3 by discriminating against children with disabilities"; (2) whether the board "misconstrue[d] * * * § 16–77.1–2 by ordering Chariho to pay tuition for students at the [c]harter [s]chools based on actual enrollment"; and (3) whether the commissioner erred "by not affording Chariho notice and a hearing with regard to the calculation of the exact amount of tuition that Chariho allegedly owe[d]."

## III

### Standard of Review

 "Our review on a writ of certiorari is restricted to an examination of the record to determine whether any competent evidence supports the decision and whether the decision maker made any errors of law in that ruling." *Asadoorian v. Warwick School Committee*, 691 A.2d 573, 577 (R.I.1997) (citing *D'Ambra v. North Providence School Committee*, 601 A.2d 1370, 1374 (R.I.1992)). This Court's re-

view of questions of law is *de novo*. *Pierce v. Providence Retirement Board*, 15 A.3d 957, 961 (R.I.2011) (citing *Lynch v. Rhode Island Department of Environmental Management*, 994 A.2d 64, 70 (R.I.2010)).

## IV

### Discussion

### A

### Severance

■ Chariho argues that the board's treatment of its "affirmative defense" of "unclean hands" as a counterclaim and its severance of this defense violated its right to due process. It premised its "defense" on the contention that it possessed "evidence that both [Kingston Hill] and Compass were discriminating against children with disabilities by sending them back to the public schools." Chariho also maintains that these "discrimination charges" cannot be decided apart from the tuition-reimbursement claims. The board affirmed the commissioner's approval of the hearing officer's determination that Chariho was "attempting to assert something in the nature of a counter claim," which was "tangential, at best, to the tuition reimbursement claims." We hold that the board did not err when it affirmed the commissioner's decision to sever Chariho's asserted defense and treat it as a counterclaim.

■ An affirmative defense "attacks the plaintiff's *legal* right to bring an action, as opposed to attacking the truth of [the] claim." Black's Law Dictionary 60 (6th ed. 1990). It differs from a counterclaim in that "[a] defense cannot possibly be adjudicated separately from the plaintiff's claim to which it applies" while "a counterclaim can be." *Reiter v. Cooper*, 507 U.S. 258, 265, 113 S.Ct. 1213, 122 L.Ed.2d 604

(1993). The doctrine of unclean hands constitutes an affirmative defense. *See Martellini v. Little Angels Day Care, Inc.*, 847 A.2d 838, 842 (R.I.2004). However, "[i]t is only when the plaintiff's improper conduct is the source, or part of the source, of his equitable claim, that he is to be barred because of this [bad] conduct." *Id.* (holding that the plaintiffs, who allegedly engaged in business activity from their homes while challenging the defendant's ability to operate a business on their residential street, did not have unclean hands because the "plaintiffs' alleged business activities are not in any way the source of their equitable claim") (quoting *Rodriques v. Santos*, 466 A.2d 306, 311 (R.I.1983)). "What is material is not that the plaintiff's hands are dirty, but that he dirties them in acquiring the right he now asserts." *Rodriques*, 466 A.2d at 311 (quoting Dan B. Dobbs, *Handbook on the Law of Remedies* 46 (1973)).

Here, the charter schools did not acquire their right to local district funds by engaging in the alleged discrimination against students with disabilities. Rather, they acquired this right by statute. Therefore, assuming *arguendo* that the charter schools hands are sullied by engaging in unlawful discrimination, they were not made so in acquiring the right to local district funding that they now assert. We agree with Chariho that it "should not have to bank roll * * * invidious discrimination" if its allegations are proven at a later date in a separate proceeding. However, it presented this counterclaim in an affirmative defense's clothing. As Chariho's contention of discrimination was not a true affirmative defense, the commissioner appropriately approved its severance for a separate hearing, and the board correctly affirmed.[6]

6. Although not binding on the commissioner, Rule 8(c) of the Superior Court Rules of Civil

## B

### Statutory Construction

■■■ "[W]e review questions of statutory construction *de novo.*" *Downey v. Carcieri,* 996 A.2d 1144, 1149 (R.I.2010) (citing *State v. LaRoche,* 925 A.2d 885, 887 (R.I.2007)); *see West v. McDonald,* 18 A.3d 526, 532 (R.I.2011) (citing *Pawtucket Transfer Operations, LLC v. City of Pawtucket,* 944 A.2d 855, 859 (R.I.2008)). "When interpreting a statute, our ultimate goal is to give effect to the General Assembly's intent. * * * The best evidence of such intent can be found in the plain language used in the statute. Thus, a clear and unambiguous statute will be literally construed." *Steinhof v. Murphy,* 991 A.2d 1028, 1036 (R.I.2010) (quoting *State v. Germane,* 971 A.2d 555, 574 (R.I.2009)). "When a statute is ambiguous, however, we must apply the rules of statutory construction and examine the statute in its entirety to determine the intent and purpose of the Legislature." *In re Tetreault,* 11 A.3d 635, 639 (R.I.2011) (quoting *Harvard Pilgrim Health Care of New England, Inc. v. Rossi,* 847 A.2d 286, 290 (R.I.2004)). However, although "we are 'vested with final responsibility for statutory construction,' * * * 'where the provisions of a statute are unclear or subject to more than one reasonable interpretation, the construction given by the agency charged with its enforcement is entitled to weight and deference as long as that construction is not clearly erroneous or unauthorized.'" *Asadoorian,* 691 A.2d at 577 (quoting *Gallison v. Bristol School Committee,* 493 A.2d 164, 166 (R.I.1985)).

■■■ Chariho contends that the board "w[ove] out of whole cloth the mandate that 'Chariho is directed to pay forthwith all sums due and owing to Kingston Hill and Compass for fiscal year 2010 (the 2009–2010 school year), using as a computational basis the number of Chariho students who were actually enrolled * * * at the start of each quarter." Essentially, petitioner maintains, the board rewrote § 16–77.1–2 when it came to this conclusion. Conversely, the charter schools argue that the board "properly construed the plain language and legislative intent" of the statute.

Our careful review of the relevant sections of the "Charter Public School Act of Rhode Island" codified at G.L.1956 chapter 77 of title 16 has revealed that it is not a model of clarity. Therefore, unlike the commissioner and the board, who both found this statute unambiguous while coming to opposing conclusions after equally thorough analyses, it is our opinion that the statute is "subject to more than one reasonable interpretation." *West,* 18 A.3d at 532 (quoting *Pawtucket Transfer Operations, LLC,* 944 A.2d at 859). Nonetheless, after conducting our *de novo* review and applying deference to the board's construction of an ambiguous statute, we cannot say that the board's determination that the statute directs the local districts to make payments according to actual enrollment of the students from the local district in the charter schools at the start of each quarter was "clearly erroneous or unauthorized." *West,* 18 A.3d at 532 (quoting *Pawtucket Transfer Operations, LLC,* 944 A.2d at 860). Accordingly, we affirm the decision of the board.

■■■ As we must in fulfilling our role "as the final arbiter on questions of statutory construction," this Court "consider[s] the entire statute as a whole." *Ryan v. City of Providence,* 11 A.3d 68, 70, 71

Procedure is consistent. Rule 8(c) provides that: "When a party has mistakenly designated a defense as a counterclaim or a counter-claim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation."

(R.I.2011) (citing *D'Amico v. Johnston Partners*, 866 A.2d 1222, 1224 (R.I.2005); *Webster v. Perrotta*, 774 A.2d 68, 75 (R.I. 2001) and quoting *Sorenson v. Colibri Corp.*, 650 A.2d 125, 128 (R.I.1994)). From this comprehensive examination, we endeavor "to determine and effectuate the Legislature's intent and to attribute to the enactment the meaning most consistent with its policies or obvious purposes." *State v. Robinson*, 972 A.2d 150, 157–58 (R.I.2009) (quoting *Such v. State*, 950 A.2d 1150, 1155–56 (R.I.2008)). Here, the purpose of the "Charter Public School Act of Rhode Island" is to foster charter schools as "laboratories" to research issues in public education such as curriculum, governance, and working conditions as well as to be "vehicles for innovative learning opportunities." Section 16–77–3.1(b). The General Assembly also stated an intent for the "Charter Public School Act of Rhode Island" to support the "improvement of [public] education" in general, thus not professing a preference for either charter schools or traditional public schools but rather endorsing a vision whereby the charter schools and public schools would operate symbiotically. *Id.*; *see* G.L.1956 § 16–77.2–5(a) ("It is the intent of the [G]eneral [A]ssembly that funding pursuant to this chapter shall be neither a financial incentive nor a financial disincentive to the establishment of a district charter school."). With this legislative purpose in mind, we proceed to consider the relevant portions of the statute.

Section 16–77.1–2(d) provides, in pertinent part:

> "The state shall *make* payments of its share of operating costs to each charter public school on a quarterly basis in July, October, January, and April. The July and October payments will be *based* upon the reported student membership of the charter public school as of June 30 of the reference year as defined in § 16–7–16(11) (or the enrollment as of October 1 of the current school year in the first year of operation of a charter school)." (Emphases added.)

Section 16–77.1–2(e) reads: "Local district payments to charter public schools for each district's students enrolled in the charter public school shall also be *made* quarterly as designated in subsection (d); the first local district payment shall be made by August 15 instead of July." (Emphasis added.)

The crucial words in both of these sections are the tenses of the verb "to make." Subsection (d) uses the verb "to make" to indicate when the state's payments are due to the charter schools. They are to be made "on a quarterly basis in July, October, January, and April." Section 16–77.1–2(d). When subsection (d) indicates how the state's payments will be calculated, it uses the phrase "based upon." *Id.* Keeping this convention in mind when reading subsection (e), it becomes clear that the General Assembly intended the reference to subsection (d) to be limited to the timing of the payments in subsection (d) rather than to how they are calculated. This is so because subsection (e) states that the local-district payments "shall also be *made* quarterly as designated in subsection (d)." Section 16–77.1–2(e). (emphasis added). This parallel evinces the General Assembly's intent to incorporate into subsection (e) the quarterly payment schedule as set forth in subsection (d). Subsection (e) immediately adds a caveat extending the due date of one of the local-district payments beyond that established by the state's payment schedule, thus reinforcing the legislative intent to refer to the timing of the payments rather than the manner of their calculation.

As to calculation of payments, subsection (e) of § 16–77.1–2 provides that the

local-district payments are "for each district's students enrolled in the charter public school." It makes no mention of the reference year, as subsection (d) does. In our view, if the General Assembly also had intended for the manner in which the amounts of the state and local district's total payments to the charter schools are ultimately calculated to be the same, it would have addressed this in one subsection that applies to both the state and local districts. Therefore, an interpretation of the statute that subsections (d) and (e) separately set forth how the state- and local-district payments are calculated is reasonable.

Finally, this construction gives effect to the purposes of the statute "to advance a renewed commitment by the state to the mission, goals, and diversity of public education" as articulated in § 16–77–3.1(b). *See Steinhof,* 991 A.2d at 1036 ("When interpreting a statute, our ultimate goal is to give effect to the General Assembly's intent.") (quoting *Germane,* 971 A.2d at 574). For the intent of the General Assembly to be achieved, the charter schools must benefit from a funding mechanism that not only sustains its operations but also allows it to be "high performing." Section 16–77–3.1(a). When a charter school must educate, under petitioner's interpretation of the statute, a number of students potentially disproportionate to the amount of funding it receives from the local district, it follows that it then would be quite difficult for the charter schools to be the laboratories of learning that the General Assembly intended them to be.

By the same token, traditional public schools also could be disadvantaged if they must provide funding based on a higher number of students than actually are attending the charter schools from their district. It would contravene the stated commitment to public education in general to make it financially burdensome for the traditional and charter public schools to operate effectively. Therefore, it is our view that a construction of the statute as providing for local-district payments made quarterly based on actual enrollment is "most consistent with its policies or obvious purposes." *Robinson,* 972 A.2d at 158 (quoting *Such,* 950 A.2d at 1156). To hold otherwise would effect an "absurd result" in which the charter schools or the local school districts potentially would receive or make, respectively, payments inconsistent with the number of students attending the charter schools from the districts each quarter, thus affecting the schools' abilities to provide the highest quality of education. *See Hanley v. State,* 837 A.2d 707, 712 (R.I.2003) (quoting *Town of North Kingstown v. Albert,* 767 A.2d 659, 662 (R.I. 2001)).

We are satisfied that the "Charter Public School Act of Rhode Island" is subject to more than one reasonable interpretation. This is made abundantly apparent from our own *de novo* review of the statute and the permissible constructions offered by the parties, the commissioner, and the board. However, it is the determination of the board, which is charged with enforcing the statute, to which deference is due.[7]

---

**7.** The petitioner argues that the board's decision is not entitled to deference because it was "directed * * * to promulgate regulations to implement * * * the charter school funding statute," yet "has done nothing." General Laws 1956 § 16–77.1–7 states that "the department of elementary and secondary education shall promulgate any additional

regulations that are necessary to implement the purposes of this chapter." However, in our view, we cannot fault the department of elementary and secondary education for not deeming this an area for which it was necessary to promulgate an additional regulation. This is particularly so in light of the fact that petitioner made its payments to the charter

*Asadoorian,* 691 A.2d at 577. After reviewing this statute, while cognizant of the General Assembly's intent in its enactment, it is our opinion that the board's determination that "reference to subsection (d) in § 16–77.1–2(e) is * * * constrained to the information in subsection (d) which pertains to the quarterly payment schedule" was not clearly erroneous nor unauthorized. *See West,* 18 A.3d at 532 (noting that board's construction, when not "clearly erroneous or unauthorized," is entitled to deference "even when other reasonable constructions of the statute are possible") (quoting *Pawtucket Transfer Operations, LLC,* 944 A.2d at 860). Therefore, we hold that § 16–77.1–2(e) directs the local districts to make quarterly payments on August 15 and October, January, and April for the number of students from its district actually enrolled in the charter schools each quarter.

## V

### Hearing to Fix Dollar Amount of Tuition

 In its memoranda submitted to this Court after the writ of certiorari was issued, Chariho requests this Court to remand the case "for a hearing on the calculation of the amount of tuition owed" because the board "never specified a dollar amount as to what Chariho allegedly owed the [c]harter [s]chools because RIDE took no evidence on that issue." However, this issue was not included in the petitioner's petition for a writ of certiorari nor was it raised in its accompanying memorandum in support of the petition. "[A]s we have previously held, we will not consider any issue that is not included in a petitioner's initial petition for issuance of a writ of certiorari." *Town of Burrillville v. Rhode*

*Island State Labor Relations Board,* 921 A.2d 113, 119 (R.I.2007) (citing *Cadillac Lounge, LLC v. City of Providence,* 913 A.2d 1039, 1042–43 (R.I.2007)). Therefore, we decline to address Chariho's argument that it is entitled to a hearing on the issue of calculating a specific dollar amount of tuition owed.

## VI

### Conclusion

For the reasons stated in this opinion, we affirm the decision of the board. The petition for certiorari is denied, and the writ heretofore issued is quashed. The record shall be remanded to that tribunal with our decision endorsed on it.

Justice GOLDBERG did not participate.

---

schools according to the actual enrollment of students from its district at the charter

schools for a number of years prior to this dispute.