Jefferson DOUGLAS, Appellant,

v.

UNITED STATES, Appellee.

No. 11438.

District of Columbia Court of Appeals.

Submitted Jan. 25, 1978.

Decided April 11, 1978.

Dolores C. McCartney, Silver Spring, Md., for appellant.

Ann P. Gailis, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, William D. Pease, and John L. Kern, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before KELLY, KERN and NEBEKER, Associate Judges.

KERN, Associate Judge:

Appellant was convicted by a jury of taking indecent liberties with a child in violation of D.C.Code 1973, § 22–3501(b), and of sodomy in violation of D.C.Code 1973, § 22–3502, for which he was sentenced to concurrent terms of incarceration of two to six years on the first two charges and one to three years for sodomy. On appeal, he argues (1) that the trial court erred in refusing to suppress evidence which was alleged to be the result of a forceful entry and warrantless search of appellant's apartment, (2) that the trial court erred in admitting allegedly uncorroborated testimony of a child concerning a sexual assault, and (3) that the trial court erred in excluding testimony by a psychologist concerning appellant's incapacity to commit the type of sexual offenses with which he was charged. We affirm the convictions.

On Sunday morning, January 2, 1975, a twelve-year-old boy went to a Safeway store at Sixth and H streets, N.E., near his

home, where he hoped to earn money by assisting customers with their parcels. At approximately 10:30 a. m., a stranger offered him $6.00 if he would move some boxes for an elderly woman on E Street, N.E. The child refused at first but agreed to help after the man persisted in his request. They walked for a number of blocks until they reached a green house, where the man led the way into a second floor apartment. There, the man took the boy into a bedroom where he showed him three photographs on top of a dresser in which the man himself appeared with some women. The boy was then allowed to watch television in the bedroom for a few minutes, until the man turned off the set and instructed him to look out the window for a white truck while the man put on a "costume." When the youngster turned away from the window, he saw that the man had removed his clothes and was wearing only a pair of women's "stocking underwear." The man then sexually assaulted the boy and committed oral sodomy.

After the incident, the man gave the boy $1.00 and warned him not to tell anyone what had happened. As the boy left the house, he observed the address.

Shortly thereafter, a young acquaintance saw the boy running along H Street in the direction of his home. When he was asked what was wrong, the boy replied that there was something important which he must tell the police. The friend flagged down a passing patrol car which was driven by Metropolitan Police Officer George Hawkins II. Officer Hawkins listened to the boy's story and took him to the police station where the youth told Detective Robert Catlett what had happened. He described the apartment and the location of the photographs and told the detective that he

thought the incident had occurred at 714 17th Street, N.E. They got into a police cruiser to locate the apartment but could find no such address. Ultimately, the detective asked the boy to close his eyes and write the number just as he had seen it. The child wrote 1714. There was no 1714 17th Street, N.E., so they began checking cross-streets, and the boy identified 1714 E Street, N.E., as the place the offense had occurred.

Accompanied by the boy, Detective Catlett knocked on the door of the second floor apartment and announced that he was a police officer. Although no one answered, the detective thought he heard something in the apartment. He therefore tried the door and succeeded in unlocking it with his pocket knife.[1] They entered the apartment, and the boy showed the detective the back bedroom where he had been molested, with the television and the photographs of his assailant on the dresser, as he had previously described. While they were in the apartment the detective saw traffic violations bearing a name *later* identified as that of appellant.[2]

The next morning Detective Catlett told Officer Hawkins that he knew what the boy's assailant looked like, but he was not certain of his name. Hawkins went to the apartment and told appellant's wife that a person supposedly living at that address had traffic warrants outstanding against him. By this means he secured appellant's name, which he relayed to Detective Catlett. That same day the detective obtained a police department photograph of appellant, which had been taken as a result of a previous traffic arrest, and included it in an array of photographs which he showed to the boy. Appellant's picture was identified as the assailant. Appellant was arrested

1. During pretrial proceedings the government *conceded* that this entry into the apartment was *illegal*. At trial, a different prosecutor argued that the search could have been justified by exigent circumstances, but the court treated it as illegal. On appeal, the government notes that it does not agree that the entry had been necessarily unlawful, but because of the state of the record, it does not urge as a ground for affirmance that the search was lawful. Hence, we dispose of this case upon the assumption the search was unlawful.

2. Although this matter was raised in arguments by counsel to the trial court, no testimony was introduced either at trial or at the suppression hearing concerning whether Detective Catlett observed appellant's name at that time.

later that day, and the child identified him again from a lineup a week later.

At the time of the arrest, appellant told Detective Catlett that he had been home alone during the entire morning of the offense. At trial, however, he presented an alibi defense, stating that around 8:30 a. m. that day a neighbor helped him move a rug into his apartment. Then, at approximately 9:45 or 10:00 a. m., a friend came by and they went to a local sandwich shop where appellant talked with a waitress for about 30 to 45 minutes. From there the two men went to the home of appellant's sister where they watched television for approximately an hour and a half, and then they went to two bars at which they watched a football game. Although appellant's sister did not testify at trial, the neighbor, appellant's companion, and the waitress all appeared for the defense. Appellant's companion essentially corroborated his story, although he disagreed with appellant about the time they went home.[3] The waitress at the diner also testified that appellant and his companion had come into the place where she worked one day during November of 1975.[4]

Appellant's first contention on appeal is that the trial court erred in refusing to suppress evidence which was alleged to be the result of the forceful entry and warrantless search of appellant's apartment by Detective Catlett on the day of the offense. Appellant's particular assertion is that a photograph album was seized at that time, and that pictures from this album were used the next day in the photo array from which the complainant identified him as the assailant. This argument is factually inaccurate, however, for the record establishes that although the detective did remove a photograph from the apartment, it was not included in the identification array; instead, a photograph from the files of the Metropolitan Police Department was used. Thus, the police in no way made use of the illegally seized photograph. Because, therefore, the photograph seized had no role in the subsequent identification procedure, there simply was no specific tainted evidence for the court to suppress. *See Bynum v. United States*, 107 U.S.App.D.C. 109, 274 F.2d 767 (1960), *cert. denied*, 379 U.S. 908, 85 S.Ct. 202, 13 L.Ed.2d 180 (1964).

■ Appellant also argues generally that the warrantless search was in violation of his Fourth Amendment rights, and that *"anything* obtained or used against him as a result was inadmissible as evidence." We therefore consider the issue whether the discovery of appellant's name itself, and consequently all subsequent identifications, resulted from an illegal search and should have been excluded. The trial court ruled that suppression was not required since even if Detective Catlett had learned appellant's name by seeing the outstanding traffic tickets during the warrantless entry into the apartment, the appellant's identity had been subsequently acquired by Officer Hawkins through a means which was independent of the entry.

We agree with the trial court that the police obtained appellant's name through the efforts of Officer Hawkins rather than from the illegal search by Detective Catlett. Clearly, the address of appellant was known to the police through the complainant's identification of the place of the offense on the previous day. Testimony at trial indicated that Officer Hawkins probably was not aware of the name of the accused when he went to the apartment to determine the identity of the householder, nor of actual traffic tickets outstanding against this per-

---

**3.** According to the companion, the football game began early in the afternoon and they went home when it was over; appellant testified, however, that they did not leave the second bar until 9 or 10 o'clock that night.

**4.** There was some ambiguity in the waitress' testimony, however, for she stated that the appellant and his companion had come into the shop together during warm weather, but that she did not learn of the sexual assault until "it was real bad and icy outside." Furthermore, although appellant's companion testified that he had stayed in the car while appellant went into the shop to talk with the waitress, she said that both men came into the diner.

son.[5] Although Officer Hawkins alluded to hypothetical traffic warrants as an excuse for obtaining appellant's name without arousing the suspicions of the person whom he questioned,[6] the incidental use of this excuse cannot be said to have facilitated the police in securing the critical information, *viz.*, the appellant's name. Thus, in this case the government has sufficiently demonstrated that the appellant's identity was derived from a source which was independent of the illegal search of appellant's apartment. *See Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Silverthorne v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

■ The trial court also refused to suppress pretrial and in-court identifications of appellant by the victim, on the ground that the boy had had a good opportunity to observe his assailant during the incident,[7]

and that there was thus a source for his identification which was independent of anything suggestive which he might have seen during his visit to the apartment with Detective Catlett. This conclusion is supported by the record and therefore will not be overturned on appeal. *See Clemons v. United States,* 133 U.S.App.D.C. 27, 38, 43, 408 F.2d 1230, 1241, 1246 (1968) (en banc), *cert. denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969). *See also* D.C.Code 1973, § 17–305(a).

■ Appellant's second contention is that the trial court erred in admitting testimony of the victim—a twelve-year-old-boy—concerning the fact of a sexual assault because his account was allegedly uncorroborated. The purpose of corroboration in cases concerning sexual offenses has been to prevent baseless or mistaken accusations and to lessen the risk of unjust convictions. *See Arnold v. United States,* D.C.App., 358 A.2d

---

**5.** Detective Catlett testified that he told Officer Hawkins simply that:

> I knew what the guy looked like, but I didn't know what his name was. I requested he go by that morning—by the address, and see if anyone was home and try to secure the name of the resident.

Similarly, during direct examination Officer Hawkins was asked:

> Q. Did he give you any name he thought was going to be there?
> A. I don't recall, sir.
> Q. Where did you get the information traffic warrants were outstanding?
> A. I just brought that up, sir, because we didn't want to—if this was not the man, we didn't want to accuse anybody of a crime.
> Q. Okay. Now, did you make that up, or did Detective Catlett tell you to do that? Where did you get this?
> A. I believe Detective Catlett told me to make it up because as far as we know this is just a suspect. I didn't want to, you know, tell the lady of the house that this man was wanted for anything.

During cross-examination, Officer Hawkins was asked:

> Q. Did he [Detective Catlett] relate to you the circumstances that he found out about these traffic warrants?
> A. No, sir, he didn't. I don't recall.

The subject was also raised on redirect examination:

> Q. Officer, did you know whether or not there were any outstanding traffic warrants against Mr. Douglas?
> A. I don't recall, sir.

**6.** On direct examination Officer Hawkins was asked:

> Q. When you got to the house, what happened?
> A. I knocked on the door. A lady answered the door. I advised the lady at the house that traffic warrants were outstanding for the gentleman who lived at this address. We would like to get his name, and date of birth, and stuff like this to check and see if he is going to pay his warrants.

The exchange during cross-examination was as follows:

> Q. You said you went to the apartment house and you spoke to—a woman answered the door.
> A. Yes, sir. Yes, sir.
> Q. Did you tell this woman, in fact, you were looking for Jefferson Douglas?
> A. No, I didn't, sir.
> Q. Did you tell her Jefferson Douglas had traffic warrants?
> A. I told her a subject living at this address had outstanding traffic warrants. We just wanted to ascertain the name and address and all, so we could check it out.

**7.** The boy testified at the suppression hearing that he had been with the man for about one hour, during which time he had taken a good look at his face, and that the apartment had been well-lit.

335, 348–52 (1976) (en banc) (Mack, J., concurring in part and dissenting in part); *In re W.E.P.,* D.C.App., 318 A.2d 286, 288 (1974); *Moore v. United States,* D.C.App., 306 A.2d 278, 280 (1973); *Coltrane v. United States,* 135 U.S.App.D.C. 295, 298–301, 418 F.2d 1131, 1134–37 (1969). Courts have exercised special caution where, as here, they were dealing with the allegations of children. *See Robinson v. United States,* D.C. App., 357 A.2d 412, 415 (1976). In the instant case, the judge instructed the jury that there must have been sufficient corroboration of the testimony of the complaining witness for the jurors to conclude beyond a reasonable doubt that his account of the offense was not a fabrication. *Id.* at 416, *citing United States v. Gray,* 155 U.S. App.D.C. 275, 276, 477 F.2d 444, 445 (1973).[8]

■ Corroborative evidence can be either direct or circumstantial. *See (Robert) Davis v. United States,* D.C.App., 370 A.2d 1337 (1977); *In re W.E.P., supra* at 288; *Coltrane v. United States, supra* 135 U.S. App.D.C. at 301, 418 F.2d at 1137. Moreover, the amount of corroboration which is necessary depends on the facts of each case. *See (Robert) Davis v. United States, supra* at 1339. Determining the quantum of proof which should be required in a particular situation involves considerations of "the age and impressionability" of the complainant and "the presence or absence of any apparent motive to falsify or exaggerate." *Robinson v. United States, supra* at 416, *quoting United States v. Gray, supra* 155 U.S.App.D.C. at 276, 477 F.2d at 445. Among the circumstantial details which a jury may consider to be corroboration are testimony which establishes that the victim had an adequate opportunity to observe the defendant; the promptness of a report by the complainant to the police; the emotional condition of the complainant at the time of the report; the consistency of the complainant's testimony with prior statements regarding the offense; the opportunity of the defendant to commit the crime; and the conduct of the accused at the time of his arrest. *See (John) Davis v. United States,* D.C.App., 367 A.2d 1254, 1270 and n.31 (1976); *In re W.E.P., supra* at 288–89.

■ There was adequate corroboration in the present case to enable a jury to conclude beyond a reasonable doubt that the complainant's account of the incident was not a fabrication. The boy was twelve years old at the time of the event; he was thirteen when he appeared before the jury,[9] and the trial court prior to his testimony found him to be a competent witness. The complainant stated that appellant was a stranger to him, and thus there was no apparent reason for him to falsify or exaggerate his story. The boy's testimony established that he had had an adequate opportunity to observe the assailant during the time (almost an hour) that he was with him. At trial a young acquaintance testified that on the day of the alleged incident he saw the complainant running along H Street, N.E., in the direction of the complainant's home. When the friend asked what was wrong, the boy replied he could not talk right now because there was something important which he must tell the police first. Thus, there was in this case an immediate report of the event by complainant to the police. In addition, the statements which he made to the police when he reported the crime included a description of the scene of the offense and were consistent with his subsequent testimony during the pretrial suppression hearing and at trial. Furthermore, appellant's own statements to the police at the time of the arrest—*i. e.,* that he had been home alone at the time of

8. This court has recently discarded the long-established requirement of corroboration in rape cases, at least where the victim is a mature female. *Arnold v. United States, supra* at 344. Although we do not view *Arnold* as having removed from the trial court the discretion in some instances to require corroborative evidence of a sexual offense involving a minor victim, it is unnecessary to rule directly on this issue in this case; the giving of the instruction here could not have prejudiced appellant.

9. The testimony of much younger complainants has been credited in prior cases. *See Robinson v. United States, supra* (six-year-old child); *Moore v. United States, supra* (ten-year-old child).

the offense—were inconsistent with the alibi defense which he presented at trial and would establish his opportunity to commit the crime. Moreover, there were certain differences between appellant's testimony and that of other defense witnesses. Thus, there was ample supporting evidence in the case.

Appellant's final contention is that the trial court erred in excluding testimony and a written report by a psychologist that in his opinion the defendant did *not* have the capacity to commit the type of crime with which he was charged. He cites *United States v. Brawner,* 153 U.S.App.D.C. 1, 471 F.2d 969 (1972) (en banc), for the proposition that where experts have meaningful information to impart, their testimony should not be blocked by requirements that unnaturally restrict communication between the expert and the jury.[10] This argument is unpersuasive, however, for it fails to appreciate the distinction which must be drawn between testimony which assists the jury to fulfill its role as factfinder in the controversy, and testimony which instead usurps this truth-seeking function.

■ Initially, we note that our scope of review on this issue is narrow, for the "trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). *See Dyas v. United States,* D.C.App., 376 A.2d 827, 831 (1977). On the record in this case, we conclude that the trial court properly excluded the evidence.

■ It is without dispute that "the 'defense should be free to introduce appropriate expert testimony,'" *Fennekohl v. United States,* D.C.App., 354 A.2d 238, 240 (1976), *quoting Kaplan v. California,* 413 U.S. 115, 121, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973), and such evidence should be admissi-

ble if "the opinion offered will be likely to aid the trier [of fact] in the search for truth." *Jenkins v. United States,* 113 U.S. App.D.C. 300, 306, 307 F.2d 637, 643 (1962). *See United States v. Amaral,* 488 F.2d 1148, 1152 (9th Cir. 1973) (expert testimony is admissible if "the jury can receive 'appreciable help' from such testimony," *quoting* 7 Wigmore Evidence § 1923 (2d ed. 1940)). Courts have recognized, however, that because scientific or expert testimony possesses an "aura of *special* reliability and trustworthiness," *United States v. Amaral, supra* at 1152 (emphasis added), the reception of such evidence must be more limited than would be the case of similar non-expert testimony. Several of the testimonial and subject matter qualifications which govern the admissibility of expert testimony are applicable in this case.

■ First, the subject matter of the expert testimony "must be so distinctively related to some science, profession, business or occupation *as to be beyond the ken of the average layman.*" *Dyas v. United States, supra* at 832, *quoting* McCormick on Evidence, § 13 at 29 (E. Cleary, 2d ed. 1972) (emphasis in original). There is no showing in this case that the subject matter of the proffered testimony was so far removed from human experience as to require the assistance of an expert in understanding the issue, and so the trial court was not required to admit the evidence.

■ Moreover, even relevant and material information must be excluded if its admission would create a substantial danger of undue prejudice or would mislead the jury. *See United States v. Amaral, supra* at 1152. In the instant case, the psychological report said in pertinent part:

In terms of sexual functioning, there is nothing in his psychological test protocol which would indicate that he would have oral sexual activity with a young boy. Mr. Douglas reports active and satisfying

---

10. This court has specifically ruled that *Brawner* is not controlling law in this jurisdiction, since it was issued subsequent to the effective date of the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No.

91–358 (July 29, 1970) (effective Feb. 1, 1971). *Bethea v. United States,* D.C.App., 365 A.2d 64, 69–70 (1976). *See M.A.P. v. Ryan,* D.C.App., 285 A.2d 310 (1971).

heterosexual functioning, and an absence of homosexual activity. Also, he appears to have a negative bias against oral sexual activity. . . .

Thus, on the basis of the interview and the psychological test results, *it is my professional opinion that it would be unlikely that Mr. Douglas would engage in oral sexual behavior with a young boy.* (Emphasis added.)

The substance of this report, and trial testimony which would have been similar in tone, addresses not only the issue of appellant's mental condition, but also the question whether or not he could have actually engaged in the conduct described by the complaining witness. Because of the authoritative quality which surrounds expert opinion, this testimony could have been given undue deference by a jury. It is the responsibility of the trier of fact, however, and not the duty of the expert, to determine the ultimate question of whether or not appellant had the capacity to commit the type of crime with which he had been charged; the testimony of a psychologist on this subject therefore was not admissible. *See Washington v. United States,* 129 U.S. App.D.C. 29, 41, 390 F.2d 444, 456 (1967).[11]

 Furthermore, "expert testimony is inadmissible if 'the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert.'" *Dyas v. United States, supra* at 832, *quoting* McCormick on Evidence, § 13 at 31 (E. Cleary, 2d ed. 1972). In the instant case, the defendant, through expert testimony, was attempting to prove that the absence of articulated or observable sexual abnormalities established the fact that he did not commit the particular offense with which he had been charged. We do not regard the field of psychology as being so exact, however, as to be able to determine with sufficient reliability that an individual did *not* commit a certain act, based solely on the presence of some characteristics and the absence of certain ob-

servable symptoms. *Cf. Murel v. Baltimore City Criminal Court,* 407 U.S. 355, 364 n.2, 92 S.Ct. 2091, 32 L.Ed.2d 791 (1972) (Douglas, J., dissenting); *In re Ballay,* 157 U.S. App.D.C. 59, 77, 482 F.2d 648, 666 (1973); *Frye v. United States,* 54 App.D.C. 46, 47, 293 F. 1013, 1014 (1923). Because appellant was attempting to establish such a proposition in this case, the testimony was therefore properly excluded by the court on this ground also.

*Affirmed.*

---

11. We note that the case on which appellant exclusively relies, *United States v. Brawner, supra,* itself cautions that a jury must not be "confronted with ultimate opinions on a take-it-or-leave-it basis." *Id.,* 153 U.S.App.D.C. at 38, 471 F.2d at 1007.