*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-0504

DANIEL GETER, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2018-CF3-004743)

(Hon. Robert Okun, Trial Judge)

(Submitted January 21, 2022                     Decided December 21, 2023)

*Thomas D. Engle* and *Sharon L. Burka* were on the brief for appellant.

*Michael R. Sherwin*, Acting United States Attorney at the time, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, *Puja Bhatia*, *Andrea Duvall*, and *Michael E. McGovern*, Assistant United States Attorneys, were on the brief for appellee.

Before EASTERLY and DEAHL, *Associate Judges*, and GLICKMAN,[*] *Senior Judge*.

---

[*] Judge Glickman was an Associate Judge at the time of submission. His status changed to Senior Judge on December 21, 2022.

EASTERLY, *Associate Judge*: We consider once again in this case the admissibility of testimony of a firearms and toolmark examiner connecting specific shell casings to a specific gun. We also consider the admissibility of testimony from two Metropolitan Police Department detectives identifying appellant Daniel Geter in video surveillance footage even though the government had not established that they had any special ability to make such an identification. We hold that neither the examiner's testimony connecting specific shell casings to a specific gun nor the detectives' identification testimony should have been admitted. But in light of the additional evidence against Mr. Geter, we conclude these errors do not require reversal of his convictions of various assault and gun crimes in connection with the nonfatal shooting of Jessica Little.

## I.     Facts and Procedural History

The evidence at trial established that, on the evening of March 17, 2018, Ms. Little went to 1219 Simms Place, NE, with her friend Jalinda Counts, to celebrate Ms. Counts's birthday.[1] After they arrived, they stood out front with at least one other person. Ms. Little and Ms. Counts were both smoking marijuana,

---

[1] Many of the details of the evening came from Ms. Counts's sworn testimony to a grand jury two months after the shooting, excerpts of which were read to the jury and were admitted into evidence for their truth.

and Ms. Counts was drinking alcohol. Sometime later, Ms. Counts's boyfriend, Daniel Geter, arrived with his brother. Ms. Little had not met either man before. Mr. Geter asked about Ms. Counts's outfit. Ms. Little told Mr. Geter the outfit belonged to her and asked him what was wrong with it. Ms. Counts then walked Mr. Geter across the street both to cut off the conversation between Mr. Geter and Ms. Little and to ask him if they were still going out.

As they discussed their plans, Ms. Counts told Mr. Geter that Ms. Little would be riding in Ms. Counts's car. Mr. Geter "didn't take that too well," and responded, "Who? Her? . . . No, she not"; he then said, "[y]ou all can all go ahead," and, "I can give us a ride." Just after Mr. Geter and Ms. Counts walked back across the street toward Ms. Little, Ms. Little was shot three times in the legs. Ms. Little did not see who had fired the shots. Although Ms. Counts, who was still involved with Mr. Geter at the time of trial, denied seeing the gunman, she had told the grand jury, *see supra* n.1, that she saw Mr. Geter "raise his arm" before she heard gunshots and ran.[2] Ms. Counts testified that she returned to her friend and waited at the scene for an ambulance to arrive but did not see Mr. Geter in the area after the shooting.

---

[2] One of the two detectives who served Ms. Counts with a grand jury subpoena at work, Detective Justin Marlow, also testified that Ms. Counts told him Mr. Geter had shot Ms. Little. This statement was not recorded, however; though Detective Marlowe and his colleague Detective Sidney Catlett were accompanied by two uniformed officers with bodyworn cameras, one of whom filmed their initial encounter with Ms. Counts, the detectives asked them to leave.

Officer Robert Marsh was in the vicinity of 1219 Simms Place, NE, at the time of the shooting, and when he heard gunshots, he biked in their direction. He encountered some people walking away from Simms Place in the alley off that street. One of the men was wearing dark clothing. When this individual turned into a connecting alley, Officer Marsh followed; he then observed that this individual, who was standing near some trashcans, was now wearing a white t-shirt. The individual fled from Officer Marsh, but Officer Marsh ran after him. Officer Marsh stopped the individual, identified as Mr. Geter, in the 1100 block of Raum Street. Officer Marsh later returned to the location where the foot chase began. He found a black jacket with a water bottle inside of it near the trashcans where he had seen the man in a white t-shirt, and a gun "in th[e] backyard [of 1211 Simms Place, NE,] along the fence line . . . to the alleyway."

That same evening, Mr. Geter was interviewed by the police at the Fifth District building. He denied involvement in the shooting. One of the detectives who interviewed him, Detective Marlow, noted he was not wearing a coat, although it was "rather cold" that night. When asked if he had a coat, Mr. Geter said he had left his jacket in the car. The detective also took note of the fact that Mr. Geter was wearing (1) a "white t-shirt,"[3] (2) "dark colored pants," and (3) white "Nike

---

[3] The detective did not provide any more detail about Mr. Geter's shirt; as documented in the video of the interview played for the jury, Mr. Geter was wearing

Jordan's" with blue soles. A few days later, Mr. Geter was formally arrested and re-interviewed. He again denied involvement, but mid-interview requested to use the phone and made several calls in which he asked people to cash his checks and send him money, to ensure that "Linda" kept her story straight, and to delete his social media posts and text messages on his cell phone.

At trial, the government presented testimony from a DNA expert who had examined samples from the black jacket, the water bottle, and the gun, all recovered near the scene. The expert testified that she had found a four-person mixture of DNA on the jacket, including from at least one male contributor, and that obtaining that particular mixture was "815 sextillion times more likely if the DNA originated from Daniel Geter and three unknown individuals than if the DNA originated from four unknown, unrelated individuals."[4] The expert excluded Mr. Geter as a contributor to the sample from the water bottle. The expert also testified that the samples from the gun and the magazine contained an at-least-four-person mixture of DNA, including at least one male contributor, but the mixtures were not interpretable.

---

a white T-shirt with black text and a bold red, blue, and yellow graphic covering the front, and black stripes on the sleeves.

[4] Although the expert did not define a sextillion for the jury—it is $10^{21}$, i.e., one followed by twenty-one zeros, *see* Webster's Third New International Dictionary (unabridged 1981)—she told them 815 sextillion is "a very high number" and agreed that this was "a strong statistic."

In addition to DNA evidence, the government presented expert testimony from a firearms and toolmark examiner linking the five cartridge casings recovered from the scene to the gun found at the scene, *see infra* II.A.  The government also introduced video surveillance footage from four cameras at the scene.  Three of the cameras depicted the events at Simms Place, including an individual—wearing some sort of jacket or sweatshirt with a hood, dark pants, and light-colored shoes with dark soles—firing a gun.  Another camera depicted events in the alley behind Simms Place, including the same individual disposing of something by a trashcan (where a jacket, *see supra*, was subsequently found).  Because of a combination of distance and darkness, no faces are discernable in this footage.  The government called the two investigating detectives, Marlow and Catlett, to identify Mr. Geter in surveillance footage as both the gunman and the person who dropped something by the trashcan.

Lastly, the government introduced several types of evidence from Mr. Geter's phone: (1) photos of a gun and of Mr. Geter from the weeks prior to the shooting, which it argued depicted him with a jacket and sneakers that matched the evidence recovered and the clothing worn by the shooter in the video footage; (2) texts sent from Mr. Geter's phone the same day of the shooting, including one that read "I had to hurt a few people," which the government argued indicated his involvement in the events; and (3) Mr. Geter's internet search history from the days following the

incident, which documented multiple inquiries for information about the Simms Place shooting.

On March 12, 2019, the jury convicted Mr. Geter on all charges[5] and this appeal timely followed.

## II. Analysis

Mr. Geter challenges the admission of the testimony of the government's firearms and toolmark examiner purporting to link the bullet casings found at the scene of the shooting to the gun found at the scene of the shooting, and the testimony of the investigating detectives, neither of whom were present at the shooting or knew Mr. Geter, identifying Mr. Geter in surveillance footage from the scene of the shooting. We consider both of these arguments, conclude both have merit, *see infra* II. A & B., and then assess the cumulative prejudice from these errors. *See infra* II.C. Lastly, we address Mr. Geter's argument that his two counts of PFCV merge with each other under the Fifth Amendment's prohibition on double jeopardy. *See infra* III.

---

[5] D.C. Code §§ 22-401, 4502 (assault with intent to kill while armed), D.C. Code §§ 22-404.01, 4502 (aggravated assault while armed), D.C. Code § 22-4503(a)(1), (b)(1) (unlawful possession of a firearm with a prior conviction), and D.C. Code § 22-4504(b) (possession of a firearm during the commission of a crime of violence ("PFCV") (two counts)).

## A. Admission of the Firearm and Toolmark Examiner's Testimony Identifying Specific Shell Casings as Having Been Fired from a Specific Gun

The government called firearms and toolmark examiner, Gregory DiCostanzo, who had previously worked part-time for the D.C. Department of Forensic Sciences, to testify at trial about his analysis of the cartridge casings found at the scene of Ms. Little's shooting. Mr. DiCostanzo explained that there are three "types of conclusions" that a firearms and tool mark expert may reach "when comparing either casings to one another or when comparing casings to a test-fire cartridge" (fired from a particular gun): (1) "'In,' meaning it matches"; (2) "'Out,' meaning that it doesn't match"; and (3) "Inconclusive," meaning "it's enough to say it could have came [sic] from the same gun but not enough to say that it definitely did." The government then asked for his conclusions with respect to the five casings found at the scene of Ms. Little's shooting and the test cartridges fired from the gun found at the scene. Mr. DiCostanzo told the jury that, by examining the "unique" markings which come from the "breech face, . . . the rear-most part of th[e] firearm that the cartridge casing sits up against . . . [and which] are transferred onto the back of th[e] cartridge casing" when a gun is fired, he could tell both that all five of the cartridges were "fired from the same gun, and they all matched the[] test-fires" conducted on the gun recovered from the scene. Mr. DiCostanzo thus concluded, "these five cartridge casings came from [that] firearm."

Because Mr. Geter did not object to the admission of Mr. DiCostanzo's testimony, we review his challenge on appeal to the admission of this evidence for plain error. "Under the test for plain error, an appellant must show (1) error, (2) that is plain, and (3) that affected [his] substantial rights." *Fortune v. United States*, 59 A.3d 949, 954 (D.C. 2013) (internal quotation marks omitted). Confronted with similar testimony in *Gardner v. United States*, 140 A.3d 1172, 1184 (D.C. 2016), that "the silver gun was the murder weapon" based on toolmark pattern matching, *id*. at 1182, we held that "a firearms and toolmark expert may not give an unqualified opinion, or testify with absolute or 100% certainty, that based on ballistics pattern comparison matching[,] a fatal shot was fired from one firearm, to the exclusion of all other firearms," *id.* at 1177. And relying on *Gardner*, we held in *Williams v. United States*, 210 A.3d 734, 743 (D.C. 2019), that "it is error for a[] [toolmark] examiner to provide unqualified opinion testimony that purports to identify a specific bullet as having been fired by a specific gun via toolmark pattern matching." As we explained in *Williams*, although this kind of opinion testimony may be permitted at some future time, "the empirical foundation does not currently exist to permit [firearms and toolmark] examiners to opine with certainty that a specific bullet can be matched to a specific gun," and thus, "these conclusions are simply unreliable." *Id.* at 742. Based on *Gardner* and *Williams*, we conclude that the admission of Mr. DiCostanzo's testimony that the recovered shell casings were fired

by the recovered firearm was error that was plain under current law, satisfying the first two prongs of the test for plain error review. *See Malloy v. United States*, 186 A.3d 802, 814-15 (D.C. 2018) (explaining that "[to] satisfy plain error review, there first must be a finding of . . . a [d]eviation from a legal rule" and second a determination "that [the] error was 'plain,'" i.e., not "subject to reasonable dispute" under law assessed at the time of appellate review) (internal quotation marks omitted)).

The government argues, however, that Mr. DiCostanzo's testimony is not error under *Gardner* and *Williams* because Mr. DiCostanzo "did not state . . . that [the casing] markings were unique to one and only one gun, . . . that he had 'no doubt' about the match[,] . . . [or] that his opinion was rendered with absolute or 100 percent certainty," and therefore did not provide an "unqualified" opinion. We are unpersuaded.

First, although Mr. DiCostanzo "did not state . . . that [the casing] markings were unique to one and only one gun," he did testify that the inside of the gun had "unique" markings which were transferred to the shell casings when the weapon was fired. These statements are effectively the same; both assert a basis for linking specific shell casings to a specific gun. Second, the government's argument ignores the foundation for this court's holdings in *Gardner* and *Williams*, namely the fact that the research does not exist to say that a specific bullet can be matched to a

specific gun based on pattern matching. *Gardner*, 140 A.3d at 1184; *Williams*, 210 A.3d at 739-42. In other words, the core problem is not unfounded assertions of certainty, but rather the absence of data to support the proposition that "every gun produces 'unique' toolmarks such that a gun can be matched to a fired bullet or vice versa." *Williams*, 210 A.3d at 741 n.15 (internal quotation marks and citation omitted); *see also Gardner*, 140 A.3d at 1183 (acknowledging "[t]he validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks has not yet been fully demonstrated"). Third, the government's argument rests on a misunderstanding of the use of the word "unqualified" in *Gardner*. In *Gardner*, the defense moved to preclude the firearms and toolmark examiner from testifying "[with] any scientific certainty" that the "bullet that was recovered from the decedent is consistent with . . . one of the pistols that he was given to examine." 140 A.3d at 1181. The trial court ruled that the government could present testimony in accordance with its proffer, i.e., that "Government Exhibit 71 [the silver gun] fired the bullet that was found in [the decedent's] [body]." *Id.*; *see also id.* at 1182. Although at no point did the examiner actually state "to a scientific certainty" that there was a match, on appeal, Mr. Gardner renewed the argument that the examiner should not have been permitted to "express[] an opinion 'with scientific certainty' ('essentially an unqualified opinion') that the silver gun found near the scene of the crime fired the fatal bullet." *Id.* at 1182. Clearly using the word unqualified in the

sense of "not modified or restricted by reservations," *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/unqualified (last visited Oct. 17, 2023); https://perma.cc/5BU3-6EQP, this court agreed and held that the admission of the examiner's "unqualified" opinion was error, *id.* at 1177, 1184. Just as in *Gardner*, Mr. DiCostanzo's opinion was "unqualified": having acknowledged that pattern matching could be "inconclusive" in some cases—meaning "it's enough to say it could have came [sic] from the same gun but not enough to say that it definitely did"—he testified, without reservation, that the "unique" marks from the inside of the gun transferred to the shell casings recovered in this case allowed him to conclude "these five cartridge casings came from this firearm." Accordingly, Mr. Geter has established that admission of Mr. DiCostanzo's testimony was error.

Alternatively, the government contends that the erroneous admission of Mr. DiCostanzo's testimony "was not 'clear under current law.'" *See Conley v. United States*, 79 A.3d 270, 289 (D.C. 2013) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). The government cites to footnote 19 of *Gardner*, which states that the court's "holding is limited in that it allows toolmark experts to offer an opinion that a bullet or shell casing was fired by a particular firearm, but it does not permit them to do so with absolute or 100% certainty." 140 A.3d at 1184 n.19. The government argues that it remains unclear "whether . . . a toolmark expert [is prohibited] from stating that a casing was fired by a particular firearm . . . or only

prohibits such opinions when accompanied by certainty statements that purport to exclude all other firearms as well." This argument fares no better than the government's argument that the admission of Mr. DiCostanzo's opinion testimony was not error.

As we indicated in *Williams*, footnote 19 in *Gardner* must be construed in a way that is consistent with *Gardner*'s holding that the admission of the firearms and toolmark examiner's testimony in that case was error. *See Williams*, 210 A.3d at 740. The firearms and toolmark examiner in *Gardner* did not make any explicit certainty statements. *Id*. (citing *Gardner*, 140 A.3d at 1184). Even so, the court disapprovingly characterized the examiner's testimony as "unqualified" because, *implicitly* excluding all other possibilities, he represented that a specific bullet came from the specific firearm at issue in that case. *See Gardner*, 140 A.3d at 1182, 1184 (examiner answered "[i]t was fired from the pistol" when asked if the bullet was just "consistent with" being fired from the purported murder weapon, and then reasserted "[i]t was identified as having been fired from [the pistol]"); *see also Williams*, 210 A.3d at 739 n.8 (noting that the expert in *Gardner* "did not additionally, expressly state that he was without any doubt about his conclusion").

The court's objective in footnote 19 was to flag the lingering question of how extensively that testimony must be *explicitly qualified* in order to become admissible, given the continuing lack of foundation for definitively linking specific

bullets to specific guns based on pattern-matching. The court began the footnote by noting that the parties had not made "any explicit arguments based upon either *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), or *Dyas v. United States*, 376 A.2d 827 (D.C. 1977)," which, prior to this court's en banc decision in *Motorola Inc. v. Murray*, 147 A.3d 751 (D.C. 2016), set forth the standard for the admissibility of expert testimony in the District. *Gardner*, 140 A.3d at 1184 n.19. Thus, the court explained that its holding was "limited" in that it still allowed firearms and toolmark examiners to testify, just not with "absolute or 100% certainty," as the examiner had done in *Gardner*. *Id*. Lastly, the court noted that it may stretch reliability principles even to state such an opinion "with a reasonable degree of certainty." *Id.* (internal quotation marks omitted). Resuming this discussion of how qualified such opinion testimony must be, this court in *Williams* highlighted conclusions from the President's Council of Advisors on Science and Technology not only that "such [pattern matching] testimony should not be admitted without a verifiable error rate," 210 A.3d at 741, but also that "error rates" have yet to be "develop[ed] . . . for any

pattern-matching ballistics analysis,"[6] *id.* at 741 & n.15 (citations omitted).[7]  In sum,

the government cannot rely on footnote 19 in *Gardner* to argue that the law did not

clearly bar Mr. DiCostanzo's testimony matching a specific bullet to a specific gun

without *any* explicit statement of uncertainty or qualification.

We thus conclude that admission of Mr. DiCostanzo's opinion testimony was

plainly in error.  This does not end our analysis, but we defer our discussion of the

---

[6] Quoting from An Addendum to the [President's Council of Advisors on Science and Technology] Report on Forensic Science in Criminal Courts 6, 9 (Jan. 6, 2017), we explained,

> neither experience, nor judgment, nor good professional practices . . . can substitute for actual evidence of foundational validity and reliability.  The frequency with which a particular pattern or set of features will be observed in different samples, which is an essential element in drawing conclusions, is not a matter of "judgment."  It is an empirical matter for which only empirical evidence is relevant.

*Williams*, 210 A.3d at 741 n.15.

[7] We have yet to resolve how explicitly a firearms and toolmark examiner's testimony must be qualified when providing testimony that purports to link specific shell casings to a specific gun, but our recent opinion in *Gordon v. United States*, 285 A.3d 199, 219-20 (D.C. 2022), provides some guidance.  In *Gordon*, this court determined that "the trial court did not err—let alone plainly err—by failing to sua sponte strike" a firearms and toolmark examiner's testimony where the examiner testified only that the six casings found at the crime scene "'most likely' were fired from some type of Glock semiautomatic pistol" and "that the two bullets [recovered from victim's body] were 'consistent' with a Glock," but that "he could not exclude another type of gun, or say conclusively that they were fired from the same gun." *Id.*

third prong of plain error until after our discussion of the other error identified by Mr. Geter.  *See infra* II.C.

## B.  The Testimony of the Investigating Detectives Identifying Mr. Geter in Surveillance Footage from the Scene of the Shooting

The government also presented testimony from both investigating detectives in which they purported to identify Mr. Geter in surveillance footage from the night of the shooting, captured by four different video cameras (one color,[8] three black-and-white), none of which captured clear images of any facial features.  Neither detective indicated at any point that they had any prior acquaintance with Mr. Geter, and their identifications were not based on any well-known bodily features or patterns of movement.  Rather, they identified him in the video exclusively by his clothing, with which they asserted familiarity as a result of interviewing Mr. Geter on the night of the shooting (Detective Marlow) or reviewing the video footage of that interview (Detective Catlett).

Starting with the color recording from a camera at 1210 Simms Place, Detective Marlow identified Mr. Geter as one of a group of people who "went up to

---

[8] The footage depicts a nighttime scene, and the color scheme is mostly a muted palette of browns and greys; the only colors clearly visible are the blue and red in the lights and decals of the police cruisers that responded to the shooting and were much closer to the camera than to 1219 Simms Place and the alley the shooter and his companion used as their escape route.

the steps to the porch" where Ms. Little was later shot. Detective Marlow explained that he was able to identify Mr. Geter "based off of the shoes, [the] jacket, and the white shirt that [Mr. Geter] was wearing." Thereafter, the detective continued to identify Mr. Geter in this and other videos on the basis of "the white sneakers and . . . the white t-shirt and the dark top." While viewing black-and-white footage from another camera at the front of 1215 Simms Place, Detective Marlow told the jury he could see Mr. Geter arrive at 1219 Simms Place, noting the "clear shot of Mr. Geter's sneakers as he's walking up the street," and "[t]he interaction of the clothing there. And here again the sneakers. White t-shirt under the jacket." After the video showed two individuals cross the street, Detective Marlow testified that Mr. Geter crossed back to 1219 Simms Place and briefly talked to his brother before the shooting began. And viewing footage of the same location from directly across the street, Detective Marlow told the jury, "[t]his is Mr. Geter with the firearm in his hands . . . again the sneakers. The white, the blue soles, and the base. And right down is the firearm, and he's backing up." Lastly, viewing footage from a camera in the alley off Simms Place, Detective Marlow described seeing "Mr. Geter running back here and taking his jacket off" before fleeing from Officer Marsh, the patrol officer on a bike.

Next, the government asked Detective Marlow to "describe" the "specific clothing that was notable." The detective repeated that the "dark-colored jacket"

and "light t-shirt or white t-shirt" both "stuck out" to him, and elaborated in more detail on "the sneakers," explaining that they "were very distinctive. . . . It was a pair of Jordan's that were a very distinct color. So it was a white on the top of the shoe, and the base or the bottom of the shoe was blue." Presenting Detective Marlow with some "zoomed-in image[s] of the video footage," the government asked him to show the jury where he saw "markings" on the shoes. Detective Marlow did not identify any "markings" but explained that "in the video, you can see the top portion of the sneakers, and both feet are white. And as [Mr. Geter] walks, you can see the contrasted color of the dark blue in the sneakers and the basic shoe as he walks." Detective Marlow maintained that Mr. Geter's shoes were "very distinctive" in both the color and the black and white footage.

The government then established Detective Marlow's familiarity with Mr. Geter's clothing on the night of the shooting by showing him video footage of the police interview he had conducted with Mr. Geter that same night and asking him to describe what Mr. Geter was wearing at the interview. The detective testified that Mr. Geter "was wearing the white t-shirt. He didn't have a jacket on. He was wearing dark-colored pants along with the white Jordan's. Nike Jordan's." When shown a still from the footage, he elaborated that the "white-and-blue Nike Jordan's" were "a pretty rare pair of Jordan's. This was a custom color that was redistributed. . . . [T]he color is white up top of the sneaker to include the tongue and

the strings. In the base of the shoe and the sole are blue."[9] When asked if "anyone else on scene [was] wearing such sneakers," he replied "[n]o."

The government also called as a witness Detective Catlett, who interviewed Mr. Geter when he was arrested a week after the shooting, and played him much of the same surveillance footage. Detective Catlett identified Mr. Geter as "[t]he individual with the—who points the handgun" in the black-and-white video footage from one of the cameras at the front of 1215 Simms Place. The government never asked Detective Catlett to provide a foundation for that identification, but he had testified earlier on direct examination that he had "watch[ed] the interview" of Mr. Geter conducted by Detective Marlow and observed that Mr. Geter was "wearing a white T-shirt, black pants, and white shoes," and that "once we recovered surveillance footage, we also observed that the suspect of the offense was wearing the same type of clothing." Detective Catlett also repeatedly referred to a person in the footage from several cameras as "the subject" or "the defendant," describing him as "wearing white tennis shoes" and "dark-colored pants," "fir[ing] a handgun multiple times," and "tak[ing] his jacket off."

---

[9] Detective Marlow explained that he knew this was a custom color because there has been "so much violence at some of them sneaker stores" when new shoes were issued that "the police department identifies what sneakers are coming out" and "let[s] [everyone] know."

Defense counsel objected the first time Detective Marlow identified Mr. Geter in the video footage.[10] But defense counsel did not object to subsequent identifications by either detective, and Mr. Geter has conceded that the court's implicit admission of the detectives' identification testimony should be reviewed for plain error. As explained above, "[u]nder the test for plain error, an appellant must show (1) error, (2) that is plain, and (3) that affected [the appellant's] substantial rights." *Fortune*, 59 A.3d at 954 (internal quotation marks omitted).

We agree with Mr. Geter that the admission of the detectives' identification testimony was both error and plainly so under our decision in *Sanders v. United States*, 809 A.2d 584 (D.C. 2002), and its progeny.

In *Sanders*, we interpreted what it means under Federal Rule of Evidence 701 for a lay witness's opinion testimony to be "rationally based on the perception of the witness" and held that "lay witness opinion testimony regarding the identity of a person in a surveillance photograph or . . . videotape" is not admissible unless it is "rationally based on the perception of a witness who is familiar with the defendant's appearance *and* has had substantial contact with the defendant." *Id.* at 594 n.11, 596

---

[10] The resolution of the objection is unclear. After defense counsel stated that there was "no foundation for knowing that it's Mr. Geter," the court responded "I think that's fine. Objection sustained." But the court did not then inform the jury to disregard Detective Marlow's identification, and it permitted the government to elicit similar testimony from both detectives with no protest from defense counsel.

(emphasis added).[11] Applying this rule, we concluded that the identifications made in *Sanders* were reliable. *Id.* at 596. One defendant was identified by his sister and someone else who had known him for over a decade; the other defendant was identified by his ex-girlfriend, a neighbor of twenty-five years, a former boss, a childhood classmate who had seen him recently, a local youth leader who had known him for "many years," and another neighbor. *Id.* at 593 n.10; *see also id.* at 594 (detailing the trial court's finding that the "individuals . . . [were] very familiar with the faces, the side angles, the body, [and] the posture of the individuals who are depicted in the videotape"). In cases following *Sanders*, we have upheld the requirement that any lay opinion testimony identifying a witness in video footage or a photograph must be based on that witnesses' intimate knowledge of the person being identified. *See, e.g.*, *Hilton v. United States*, 250 A.3d 1061, 1069-71 (D.C. 2021) (individuals who made identification from video footage included police officers who had known the defendant for seven or eight years and had had recent

---

[11] In addition, the testimony must also be "helpful to the factfinder in the determination of a fact in issue." *Id.* at 596. The court explained in *Sanders* that,

> in cases such as the one before us, the trial court at least should be reasonably satisfied that because of the either obscured or altered appearance of the defendant in the photograph or the videotape, or changed appearance of the defendant, the lay witness is more likely to accurately identify the defendant than is the factfinder.

*Id.* We need not discuss these other requirements since the testimony admitted in this case did not satisfy the first.

contact with him, and another witness who had known the defendant since elementary school); *Young v. United States*, 111 A.3d 13, 14-16 (D.C. 2015) (individual who made identification from video footage had been a social worker assigned to defendant's family two years prior to the shooting, had worked intensely with them for months, and had continued to see the defendant thereafter, albeit less frequently); *Vaughn v. United States*, 93 A.3d 1237, 1271 (D.C. 2014) (although noting it was a "close call" under *Sanders*, upholding lay testimony from corrections officers who "over a period of months, had daily interaction with [the defendants] throughout the routine functions of their jobs").

This case could hardly be more different than *Sanders* or any case subsequent. Neither detective claimed either to have any familiarity with Mr. Geter's "appearance" or "physical characteristics" or to have had "substantial contact with" him. *Sanders*, 809 A.2d at 593-94, 596. Instead, they purported to identify the individual they saw in the video footage as Mr. Geter based entirely on what he was wearing. (The government asserts that the detectives relied only "in part" on the clothing for their identifications, but the record does not support such a claim. *See supra*.). The requisite foundation for the detectives' identification testimony under *Sanders* was thus non-existent, and admission of this testimony was in error and plainly so under our case law. *See Malloy*, 186 A.3d at 814-15 (explaining that "to satisfy plain error review, there first must be a finding of . . . a [d]eviation from a

legal rule" and, second, a determination "that error was plain," i.e., not "subject to reasonable dispute" under law assessed at the time of appellate review) (internal quotation marks omitted)).

The government does not argue either that the admission of the detectives' identification testimony was not error under *Sanders* or that *Sanders* is unclear. Instead, the government looks to nonbinding, out-of-jurisdiction cases,[12] the majority of which are unhelpful,[13] to support its assertion that the detectives had a sufficient basis to identify Mr. Geter in the surveillance videos admitted at trial: his clothing. The government defends the detectives' ability to testify as to their logical leaps that Mr. Geter was the shooter in the video based not on their knowledge of

---

[12] The government cites *United States v. White*, 639 F.3d 331 (7th Cir. 2001); *United States v. Zepeda-Lopez*, 478 F.3d 1213 (10th Cir. 2007); *United States v. Callum*, 107 F.3d 878 (9th Cir. 1997) (unpublished); *United States v. Henderson*, 68 F.3d 323 (9th Cir. 1995); and *People v. Larkins*, 131 Cal. Rptr. 3d 911 (Cal. Ct. App. 2011).

[13] *White* and *Henderson* fully align with *Sanders* in upholding the admission of testimony by witnesses who had long histories with the defendants in question. *See White*, 639 F.3d at 335 (rejecting challenge to identifications of defendant in surveillance photographs by his sister and ex-girlfriend, explaining that both witnesses were "very familiar" with the defendant "and thus their [lay] opinion was 'rationally based' on their perceptions"); *Henderson*, 68 F.3d at 324, 326-27 (rejecting challenge to identification of defendant in surveillance photographs by police officer who testified he had known the defendant "for approximately fifteen years and had seen him daily, weekly, or biweekly throughout that fifteen-year period"). And in *Callum*, there was no contested testimony identifying the defendant in the video footage; rather that case discussed the admission of testimony from an officer who compared the logo on a t-shirt he was holding to the logo on a shirt seen in video footage. 107 F.3d at *1.

Mr. Geter's physical appearance or their substantial contact with him, but on the information they acquired about him from investigation. We have held, however, that more is required before a lay witness may testify to the identity of an individual in video footage or a photograph. *See supra*.

The government also suggests that the detectives' identification testimony did not constitute lay opinion testimony governed by *Sanders* "because it was framed as a statement of their investigative conclusions," and these "conclusions were relevant and helpful to show the jury why appellant was arrested . . . six days after" the night of the shooting when he was interviewed "but weeks before [Ms.] Counts identified [him] as the shooter." Doubtless, a law enforcement officer testifying as a lay witness may offer a "narrative of [their] own role in the events that led to [the defendant's] arrest." *Bedney v. United States*, 684 A.2d 759, 767 (D.C. 1996). The government's relevance argument does not lay the foundation for their capacity to identify Mr. Geter in the surveillance video footage, however. Here, the detectives on direct repeatedly identified Mr. Geter, a stranger, in surveillance footage of an event they had not witnessed as if they *knew* he had been there, thereby impermissibly telling the jury to see him as the gunman in the video footage.[14] *See*

---

[14] Beyond just their identifications of Mr. Geter, much of the detectives' narrative testimony about the events depicted in the video appeared to lack any basis in their personal knowledge. *See Callaham v. United States*, 268 A.3d 833, 848 (D.C. 2022). But because Mr. Geter did not and does not raise this more wide-

*Douglas v. United States*, 386 A.2d 289, 295 (D.C. 1978) (noting "the distinction which must be drawn between testimony which assists the jury to fulfill its role as factfinder in the controversy, and testimony which instead usurps this truth-seeking function").

This is not to say that a lay witness may never be qualified to identify, from video footage, a distinctive object which they have both personal knowledge of and an ability to view in proffered video footage. Thus, for example, a detective might be able to review video footage of from one point in time and then testify about the distinctive clothing the suspect was wearing. And perhaps if an adequate foundation were laid, e.g., if the detective's observations related to their investigative decision-making, the same detective could then look at surveillance footage from the charged incident and purport to identify that same clothing in the surveillance footage. But that is not what happened here. First, the detectives never identified Mr. Geter's clothing in his interview—a white T-shirt and dark pants (but no dark jacket as seen in the surveillance footage)—as particularly distinctive; only his shoes, the white Jordans with blue soles, were identified with any detail. Second, the detectives never established that any potential distinctiveness of the clothing or shoes was visible in

ranging objection to the detectives' testimony, we limit our analysis to their identification testimony.

the nighttime surveillance footage, nor could they have, given that the footage was grainy, and in either black-and-white or a muted, mostly grey/brown color scheme, *see supra* n.7.[15] Finally, the detectives in Mr. Geter's case did not in any event limit themselves to identifying the clothing or shoes; rather they purported to use these items to identify *a specific person* with whom they had no prior relationship, in contravention of *Sanders*.

Having concluded that the admission of the detectives' identification testimony was error that was plain under our law, we consider the third prong of the test for plain error below.

## C. Prejudice Analysis

To obtain relief under the test for plain error, an appellant must show that the error in question affected the appellant's "substantial rights." *Olano*, 507 U.S. at 734-36. "[I]n most cases [the 'substantial rights' prong] means that the error must have been prejudicial: It must have affected the outcome of the [trial] court proceedings." *Id.* at 734. "To meet this third prong of plain error review, it is appellant['s] burden to show a 'reasonable probability' of a different outcome" but for the established error. *Perry v. United States*, 36 A.3d 799, 818 (D.C. 2011)

---

[15] Although the government emphasizes Detective Marlow's testimony that Mr. Geter was wearing a "rare pair" of Nike Jordans, their unique color and design features were not visible in the surveillance footage, which showed only that the shooter's shoes were light and their soles were dark.

(quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 81-82 (2004) (explaining that "where the burden of demonstrating prejudice" is on the appellant, the standard is similar to that articulated in *Kotteakos v. United States*, 328 U.S. 750, 776 (1946), which asks whether the error had "substantial and injurious effect or influence in determining the . . . verdict")). More than "a mere possibility of prejudice," the question is whether "the error in fact undermines confidence in the trial's outcome." *Williams*, 210 A.3d at 744 (internal quotation marks omitted). Here, we need not assess the individual prejudicial effect of both errors discussed above, because we conclude that even considered together, they did not affect the outcome of Mr. Geter's trial. *See Euceda v. United States*, 66 A.3d 994, 1011 (D.C. 2013) (assessing the cumulative effect of unobjected-to errors).

The government's case against Mr. Geter was strong, and the erroneously admitted portions of testimony from Mr. DiCostanzo and Detectives Marlow and Catlett were not the whole, let alone a crucial component, of the evidence implicating Mr. Geter as the individual who shot Ms. Little. On the very first day of trial, the jury heard the testimony of Ms. Counts and Ms. Little placing Mr. Geter at the scene and of Ms. Counts describing some tension between Mr. Geter and Ms. Little. The jury also heard about Ms. Counts's identification of Mr. Geter as the shooter to a grand jury within two months of the incident. The next day, the jury heard testimony from Officer Marsh that Mr. Geter—whom Officer Marsh had chased onto Raum

Street and subsequently handcuffed—was the same individual in all dark clothes whom he saw take a left into the alley behind Simms Place and emerge from behind a trashcan, wearing a white t-shirt and dark pants, as well as testimony from a DNA expert that the sweatshirt found by the trashcan in the alley contained a mixture of DNA that "favor[ed] the inclusion" of Mr. Geter's DNA. To corroborate the testimony of Ms. Counts and Officer Marsh, the jury was also shown, and given access to during deliberations, surveillance footage from four different cameras depicting an individual in dark clothes and light colored shoes with dark soles walking across Simms Place and then back again, shooting at a group of people standing on the steps in front of 1219 Simms Place, and then running into an alley perpendicular to Simms Place—surveillance footage through which the prosecution told the jury to "step into the shoes and trace the steps of the shooter."

And finally, the jury was presented with evidence recovered from Mr. Geter's phone after the shooting that could fairly be characterized as inculpatory: a call to "Linda" asking that she "be consistent with their story or account of what occurred" and to delete Mr. Geter's text messages and social media from his phone; a text message to "Bro" indicating that Mr. Geter was at "5D" and instructing the person he was texting, "[T]ell them I just pulled up with my girl. Tell Jalinda to say that I[--]," and text exchanges between Mr. Geter and a contact named "Lisa" wherein Mr. Geter expresses that he needs to tell "Lisa" something, "[doesn't] know how

[she] will take it," and then admits he "had to hurt a few people"; multiple internet searches in the days after the shooting about a "[s]hooting on Simms Street Northeast"; and multiple photos, one showing a gun similar to the gun found at the scene, and two showing Mr. Geter wearing a jacket like the one found by the trashcan, and a shirt, pants, and sneakers like those he was wearing the night of the shooting.

Given the "overall strength of the [g]overnment's case," *Dominguez Benitez*, 542 U.S. at 85, we cannot say there is a "reasonable probability that the [errors] affected the outcome" of Mr. Geter's trial, *Little v. United States*, 989 A.2d 1096, 1102 (D.C. 2010). Therefore, Mr. Geter has failed to establish the third prong of the plain error test and we must affirm the Superior Court's admission with respect to the challenged testimony.

### III. Merger of PFCV Convictions

Lastly, Mr. Geter argues that his two PFCV convictions should merge under *Nixon v. United States*, 730 A.2d 145, 152-53 (D.C. 1999). In that case, we held that "multiple PFCV convictions will merge . . . if they arise out of a defendant's uninterrupted possession of a single weapon during a single act of violence." *Matthews v. United States*, 892 A.2d 1100, 1106 (D.C. 2006) (citing *Nixon*, 730 A.2d at 153); *see also West v. United States*, 866 A.2d 74, 84 (D.C. 2005) ("We have held that multiple counts of PFCV merge when only one gun was used and the incidents

were not separated by time and location."). The government concedes that these two convictions should merge. We agree with the parties and remand with instructions to vacate one of the merged convictions.

## IV. Conclusion

For the foregoing reasons, we affirm all but one of Mr. Geter's convictions and remand to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*